United States District Court
Eastern District of New York

1:18-cv-05351

| | |
|---|---|
| Jonathan Johnson individually and on behalf of all others similarly situated | |
| Plaintiff | |
| - against - | Complaint |
| 7-Eleven, Inc. | |
| Defendant | |

Plaintiff by attorneys allege upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.     7-Eleven, Inc. ("defendant") manufactures, distributes, markets, labels and sells water products named "Pure Alkaline Water" under the 7-Select brand in various sizes, including 20 oz.

2.     The Products are sold in defendant's thousands of company and franchise stores throughout the country.

3.     The Products emphasize their ability to provide hydration in a manner superior to non-alkalinized water, thereby commanding a premium price.

4.     The representations, as shown on the Product image below, include:

•   the product name "Pure Alkaline Water,"

•   the distinctive red bottle cap and the red font "Alkaline" in the center front of the bottle

•   "Pure. Refreshing. Balancing."

•   "Alkaline Water is Ionically Charged for Intense Hydration & A Higher pH"

•   a pH Scale denoting the pH of the Product (9.5+ pH)

•   "Ionically Charged" with a lightning bolt next to a "plus" symbol and

•   "Balance & Hydration," depicted through a scale with a water droplet on each side.

1







5.     The Product's invocation of a pH scale and authoritative-sounding scientific terms such as "alkaline," and "ionically charged" with a "plus" symbol lend credibility to its claims that *this* water can provide hydration in a more effective manner (i.e., faster, more efficiently and longer

lasting) than non-alkalinized waters.

6.    In the fast-moving consumer goods category, consumers make decisions within 90 seconds of their initial interaction with a product.

7.    Depending on the context, color is a vital source of information, used to identify brands, categorize products and their functions, make comparative assumptions and guide consumer choices.[1]

8.    Color affects a consumer physiological, associational, and cultural.

9.    The associational level refers to colors that have become linked with an image or contextual relevance depending on the product category and specific item.

10.    Here, the Product's distinctive red cap, an outlier among water products, and the red font "Alkaline" gives the reasonable consumer impression that it is not your run-of-the-mill bottled water – it is a superior in hydration, having been alkalinized.

11.    In the Indo-European language and culture, the color red has perhaps the greatest symbolic resonance, because it is the color "of life-giving blood."[2]

12.    In fact, "the terms 'red', 'rouge', 'rot', or 'rosso' derive from the Sanskrit word" meaning 'blood.'" *Id*.

13.    The color red has long served the purpose of an amulet, such that in traditional cultures, a red string would be placed around the necks of children to protect them against scarlet fever and other pestilential diseases.[3]

---

[1] L. Huang et al., "Eat With Your Eyes: Package Color Influences the Expectation of Food Taste and Healthiness Moderated by External Eating," *Marketing Management Journal*, (2015) 25(2); 16.    Charles Spencer et al., "On the multiple effects of packaging colour on consumer behaviour and product experience in the 'food and beverage' and 'home and personal care' categories." *Food Quality and Preference* (2018). Vol. 68, 226-237; Hannele Kauppinen-Räisänen et al., "Exploring consumers' product-specific colour meanings." *Qualitative Market Research: An International Journal* 13:3 (2010): 287-308.

[2] John Gage, Color and meaning: Art, science, and symbolism Univ. of California Press, 1999 (p. 110).

[3] Thomas S. Sozinskey, Medical Symbolism in Connection with Historical Studies in the Arts of Healing and Hygiene, No. 9. FA Davis, 1891 (recognizing "medical virtues have been ascribed to red").

14.     Studies have demonstrated that in the bottled waters category, a "a red bottle will be perceived as being more sophisticated and more exciting than an identical blue bottle."[4]

15.     Defendant's labeling, colors and invocation of scientific terms give the impression that the Product's superiority in the realm of hydration is backed by scientific rigor, causing a reasonable consumer to believe that being alkalinized imparts hydration-promoting properties.

16.     Alkalinity is in relation to "acidic" and these terms refer to the pH level of different types of foods and beverages.

17.     The acidity or alkalinity of any solution is indicated on the pH scale ranges from 0 (strongly acidic) to 14 (strongly basic or alkaline).

18.     A pH of 7.0 is neutral and pH of blood is slightly basic (7.35 – 7.45).

19.     Food and beverages are unable to influence the pH of blood or intra- or extra-celluar liquids, as minor deviations cause serious sickness or death.

20.     The lungs, kidneys and buffer systems to regulate the blood's acid-base balance.

21.     The kidney responds to disturbances of the acid base balance through changes in H+ secretion and $HCO_3-$ reabsorption and production on a time scale of hours to days.

22.     The respiratory center in the medulla oblongata of the brain responds to pH and $CO_2$ within minutes, adjusting the breathing rate.

23.     The chemical buffer systems in both the extracellular and intracellular compartments act immediately to prevent excessive fluctuations of the blood pH.

24.     The most important pH buffer system in the blood involves carbonic acid (a weak acid formed from the carbon dioxide dissolved in blood) and bicarbonate ions (the weak base).

---

[4] Gaëlle Pantin-Sohier, "The Influence of the Product Package on Functional and Symbolic Associations of Brand Image," *Recherche et Applications en Marketing (English Edition) (AFM c/o ESCP-EAP)* 24.2 (2009).

25.    All consumed food travels to the highly acidic stomach, with a pH of c. 3.0.

26.    The low pH is necessary to break it down and sterilize any bacteria ingested.

27.    After leaving the stomach, the matter goes to the intestines where it is neutralized and slightly alkalized by pancreatic solutions.

28.    As a result, everything consumed - once it gets to the intestines–is roughly the same pH, regardless of its pH at the time it was consumed.

29.    If the pH of blood changes slightly, it will cause serious medical disturbances requiring hospitalization.

30.    Extracellular levels of other ions such as Na, K, Ca and inorganic phosphate are also barely affected by fluctuations in their respective nutritional intakes, unless their variations are very large in quantity and extend over prolonged periods.

31.    The only impact of consuming a product with a pH of 9.5 or above would be to alter the pH of the excreted urine to be more alkaline.

32.    Moreover, significant amounts of the Product would have to be consumed to even achieve such a transient change in the pH of the blood, which would be almost impossible to do in a short period of time before the body adjusts the pH back to its normal level.

33.    Defendant's claims rely on no scientific studies which can counter human physiology.

34.    Nevertheless, studies which have been touted to support purported benefits of the Products are fundamentally flawed and of no significance.

35.    For instance, one study sought to demonstrate that alkalinized water achieved superior hydration compared to non-alkalinized water.  "Effect of electrolyzed high-pH alkaline water on blood viscosity in healthy adults," *Journal of the International Society of Sports Nutrition*

13.1 (2016): 45.

36. This study compared persons who consumed alkaline water with a control group that consumed purified reverse osmosis water and used blood viscosity as a hydration marker.

37. Blood viscosity is influenced by hematocrit, red blood cell deformability, red blood cell aggregation, and plasma viscosity, but not impacted by discrete nutritional disturbances from consuming a non-medicinal beverage.

38. Moreover, dehydration can cause an increase in blood viscosity (thickness), so that an increase in water will reduce dehydration.

39. The study's conclusion – that the alkalinized water reduced blood viscosity greater than the control water – is unrelated to the water being alkalinized.

40. This is because the control group was given purified reverse osmosis water, which has had all minerals and electrolytes removed, while the alkalinized water possessed electrolytes.

41. The claims are literally false because all reasonable scientists agree that mammalian physiology allows for no causality between alkalinized foods and a change in blood viscosity, especially none that can occur in a manner described in the study.

42. That the alkalinized water in the study achieved a reduction in blood viscosity is of no significance because (1) any effect from the alkalinity of the water is negated by the acids present in the stomach and (2) the presence of electrolytes likely caused the water to be absorbed better by the body.

43. The latter reason is why global health organizations promote rehydration solutions which contain sodium and electrolytes to combat potentially fatal dehydration in developing countries as opposed to providing purified reverse osmosis water.

44. The studies purporting to substantiate defendant's claims are poorly designed,

incredible and represent the view of a minority of scientists.

45.    Defendant's representations that its Product is any more effective at providing hydration than other non-alkalinized due to its pH level are false and misleading.

46.    Excluding tax, the Products cost no less than $2.99 for 33.8 oz, a premium price compared to non-alkalinized water.

Jurisdiction and Venue

47.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2).

48.    Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

49.    This Court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

50.    Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and in New York.

51.    A substantial part of events and omissions giving rise to the claims occurred in this District.

Class Allegations

52.    The classes consist of all consumers in the following states:  all, New York who purchased any Products with actionable representations during the statutes of limitation.

53.    A class action is superior to other methods for fair and efficient adjudication of this controversy.

54.    The class is so numerous that joinder of all members, even if permitted, is impracticable, as there are likely hundreds of thousands of members.

55.    Common questions of law or fact predominate and include whether the

representations were likely to deceive reasonable consumers and if plaintiff(s) and class members are entitled to damages.

56.  Plaintiff(s) claims and the basis for relief are typical to other members because all were subjected to the same representations.

57.  Plaintiff(s) is/are an adequate representative because his/her/their interests do not conflict with other members.

58.  No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

59.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest.

60.  Plaintiff(s) counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

61.  Plaintiff(s) seeks class-wide injunctive relief because the practices continue.

<u>Parties</u>

62.  Plaintiff is a citizen of Kings County, New York.

63.  Defendant is a Texas corporation with its principal place of business in Dallas, Texas.

64.  In 2017 and/or 2018, plaintiff purchased one or more of the Products for personal consumption, for no less than $2.49 per 20 oz, excluding tax, at a store located within this district and/or State.

65.  Plaintiff paid this premium because prior to purchase, plaintiff saw and relied on the misleading representations.

<u>New York General Business Law ("GBL") §§ 349 & 350</u>

66.  Plaintiffs incorporates by references all preceding paragraphs.

67.  Defendant's acts, practices, advertising, labeling, packaging, representations and

omissions are not unique to the parties and have a broader impact on the public.

68.     Plaintiff desired to purchase products which provided the benefits described by defendant.

69.     Defendant's representations are false, unfair, deceptive and misleading for the reasons described herein.

70.     The representations and omissions were relied on by plaintiff and class members, who paid more than they would have otherwise, causing damages.

<u>Negligent Misrepresentation</u>

71.     Plaintiff incorporates by references all preceding paragraphs.

72.     Defendant misrepresented the ability of the Products to achieve the claimed effects.

73.     Defendant had a duty to disclose, in a manner prescribed by law, that its Products were not capable of providing said effects.

74.     At the time of the representations, defendant knew or should have known same were false or misleading.

75.     Defendant negligently misrepresented and/or negligently omitted material facts.

76.     Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

77.     Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, thereby suffering damages.

<u>Breach of Express Warranty and Implied Warranty of Merchantability</u>

78.     Plaintiff incorporates by references all preceding paragraphs.

79.     Defendant manufactures and sells waters which have a higher pH level than most water products.

80.    Defendant warranted to plaintiff and class members that the Products were superior to non-alkaline waters in providing hydration, when this was not truthful and was misleading.

81.    The Products did not conform to their affirmations of fact and promises, wholly due to defendant's actions.

82.    Plaintiff and class members relied on defendant's claims, paying more than they would have otherwise.

<u>Fraud</u>

83.    Plaintiff incorporates by references all preceding paragraphs.

84.    Defendant's purpose was to mislead consumers who seek foods which have a functional and beneficial effect.

85.    Defendant is capitalizing on consumer's shift from sugary juices and carbonated soft drinks to calorie-free beverages with beneficial properties.

86.    Plaintiff and class members observed and relied on defendant's claims, causing them to pay more than they would have otherwise, entitling them to damages.

<u>Unjust Enrichment</u>

87.    Plaintiff incorporates by references all preceding paragraphs.

88.    Defendant obtained benefits and monies because the Products were not as represented, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of such inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

   **WHEREFORE,** plaintiffs pray for judgment:

1. Declaring this a proper class action, certifying plaintiff(s) as representative and the

undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant(s) to correct such practices to comply with the law;

3. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and GBL claims;

4. Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and experts; and

5. Such other and further relief as the Court deems just and proper.

Dated:    September 23, 2018

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
891 Northern Blvd., Suite 201
Great Neck, NY 11021
Tel: (516) 303-0552
spencer@spencersheehan.com

Levin-Epstein & Associates, P.C.
/s/Joshua Levin-Epstein
Joshua Levin-Epstein
1 Penn Plaza, Suite 2527
New York, NY 10119
Tel: (212) 792-0046
joshua@levinepstein.com

1:18-cv-05351
United States District Court
Eastern District of New York

Jonathan Johnson individually and on behalf of all others similarly situated

Plaintiffs

- against -

7-Eleven, Inc.

Defendant(s)

# Complaint

Sheehan & Associates, P.C.
891 Northern Blvd., #201
Great Neck, NY 11021
Tel: (516) 303-0052
Fax: (516) 234-7800

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  September 23, 2018

/s/ Spencer Sheehan
Spencer Sheehan